May it please the Court, good morning. My name is Eric Ryberg. I represent the appellants, Western Watersheds, in this project, in this case. I'd like to begin with the notice of errata that was sent last week by the BLM, because that may be a source of confusion. This case, of course, is about livestock grazing near Yuma, Arizona, which, of course, is some of the most arid and hot landscape in North America. Animals like the desert bighorn sheep and desert tortoise are adapted to live there, but cows are not. It's a very cruel environment to try to keep cows alive. In 2002, the BLM sent its specialists out to this area to review it and determined that even when these areas are producing grass and forage at or near their potential, even in that circumstance, the area cannot sustain perennial, year-round livestock grazing in the manner the BLM was conducting it. They recommended that these areas be changed to ephemeral grazing, to grazing that only occurs after a storm when some additional forage emerges. With one of the areas, they said, this area is so cruel that we can't even do that. This area does not produce enough grass for any livestock grazing. Of course, Western Watersheds Project complained that in the final decision for the plan, there was no alternative that adopted the experts' recommendations. The BLM responded by saying, well, no, that actually isn't true, because those experts, with respect to the Bishop allotment, the allotment that was called for to be completely retired, we must remember that the BLM experts only said that the BLM needed to propose to retire, not actually to do it, and we did propose to retire that allotment in one of the alternatives, not the one we selected, but one of the alternatives. With respect to ephemeral grazing, the BLM says, well, but we did add ephemeral grazing. We transformed these allotments from perennial grazing to perennial and ephemeral grazing. You asked for ephemeral grazing. We gave you ephemeral grazing. Why are you complaining? I think we probably can all appreciate why that was an unsatisfactory answer. The experts had called for grazing to be reduced, to be restricted, not to have more grazing added to the area. The BLM then sent this notice of errata last week and said, oh, that was a mistake. We didn't actually transform those allotments from perennial to both perennial and ephemeral. They were always that way. My client and I have looked at the record and tried to sort out whether that's true, and I don't think there's enough material in the record to know, but it doesn't really matter. It's a minor point. The point is that every single piece of information that the BLM has about these particular grazing allotments, 100 percent of that information says these areas do not produce enough grass, even when they're producing at their best potential. They do not produce enough grass to sustain perennial livestock grazing. So when Western Watersheds Project complained that an alternative should have been at least considered that would adopt these recommendations to restrict grazing to ephemeral, the BLM said, oh, that's impossible. That's outside the scope. It's outside the scope of our project. It's impossible for us to have considered any alternative that would adopt our experts' recommendations. That's untrue, Your Honors. The scope of the project can be determined in many ways. For example, you can look at the intent of the agency. What was the agency trying to do when it created this environmental impact statement? Well, clearly the intent of the experts was, they said in every one of their reports, the intent is to at least propose transforming these areas to ephemeral grazing, not to perennial. Also, you can look at the preferred alternative of the project. Before it was, in the early stages of the analysis, the preferred alternative was to adopt wholly those expert recommendations and restrict grazing to ephemeral only in the four allotments and to retire the bishop allotment. Another place that you can. I thought the recommendation of your experts in 2002 was to essentially wipe out grazing or alternatively, if you don't want to go to that extreme, then provide at least for those four, not bishop, but for those other four, ephemeral grazing. I think you can read the reports that way, Your Honor. I think I'm taking a more conservative view, I suppose. I think that those reports are probably most appropriately read as at least ephemeral grazing is possible in these four allotments. Now, in the bishop allotment, it's certainly the case that the BLM experts did not believe grazing should occur at all. So this is a programmatic EIS. We've had changes in our law over the last ten years or so in the assessment of programmatic environmental statements. The BLM argues that to the extent that there are any problems, that they can be resolved on a site-specific EIS later on. So what's your response to that? Yes, Your Honor. This is what a district judge said in one of Western Watershed's other projects. He said, this is waving away current problems in hope of future resolution. Well, but that's what, you know, the Supreme Court has asked us to do, and McNair has changed things. So the standards for evaluating a programmatic EIS, I think, are more relaxed than they were, say, 10, 15 years ago. So bearing that in mind, my question is, will you have an opportunity, in your judgment, to contest an environmental impact statement that is site-specific in the future? I'm sorry, will we have that opportunity? Yes, and if so, why isn't that an adequate remedy, given the general programmatic statements in this EIS? I think there are a lot of questions there, but I think I can best answer them by saying, in 2002, the reports were done suggested changes need to happen in the resource management plan. Then the research management plan came along and said, well, we'll make those changes sometime in the future. The permits were renewed in 2008 for another five years without any assessments and are renewed again in 2013 without any further assessments. So there hasn't been an opportunity for anyone to challenge them. I was speaking with my client just last week about this. She's obviously very frustrated that it is so difficult to get the BLM to restrict the grazing in the way that its experts said was required. The way she put it is, it's as if they keep kicking the can down the road, but the road is five years long. These expert recommendations found in 2002 that grazing was being conducted improperly. It's now 2013 and we have permits until 2018. To get to your programmatic EIS question, I think that's a very important distinction here. When you read the programmatic EIS cases, you read a lot about hypothetical cases. The sort of standard programmatic EIS would be where an agency knows that mining permits are going to be requested somewhere on its lands, and so an EIS is prepared to determine how those mining permits will be processed in order to protect the landscape. But the agency at the moment doesn't know where those will be or when they will come. This is different. But generally they do. I mean, not maybe specifically, but they deal with the general areas. I mean, that's a small group. Sorry. They know generally where an action will take. The difference here, though, Your Honor, is grazing is an ongoing action. It's happening right now as the BLM is analyzing it. But the most important difference is that this isn't quite a programmatic EIS. And what makes it not quite a programmatic EIS are the guidelines and the regulations that govern preparing a land-use plan for grazing. When you look at the actual guidelines, this is 43 CFR 4100.0-8, they say land-use plans shall establish allowable resource uses. That's one. Two, related levels of production or use, levels of use. And three, areas of use. So allowable use, that's grazing. That's an allowable use. That's what? Allowable use. Two, levels of use. How much use? Three, where? Areas of use. How much? I'm sorry, what, how much, and where? That's what the underlying guidelines tell us this land-use plan is to determine. And levels of use is separated by commas in there. Levels of use is one of the things that a land-use plan is asked to consider and evaluate. That's what wasn't done. The BLM granted that grazing was appropriate, and the BLM did divide the area in such a way that some areas would be grazed and some wouldn't. So they answered the where and they answered the what, but they never looked at the how much. And the how much, because they never looked at that how much, their experts were unable or their expert recommendations were boxed out of the process. It became impossible for the BLM to select an alternative that would adopt the only recommendations. Isn't that your second argument, though? I thought your first argument was that NEPA requires that there be a hard look at the condition of the land at that particular point, including the soil preservation, including vegetation, including its use and use in the past and the impact of its prior use on the health of the soil. That's the hard look. I thought that was the focus of your argument, at least first, before you get into the alternatives. Is that right? You're correct that that was the first. That's different than programmatic issues, I would suppose. It's just the process. What did they look at in making this assessment, in drafting the CIS? That's right, Your Honor. Once again, we can look to the underlying regulations and guidelines that tell the BLM what an EIS is in order to determine whether they took a hard look. Obviously, it's impossible to know if an agency took a hard look at something until you know what it is they're supposed to be producing. That's what the guidelines tell us. The BLM, in its brief, said, we don't even want to talk about what those underlying guidelines are because you can't sue us over those because of Ohio forestry. That's not the point. These underlying guidelines help us understand what is being produced here and why a hard look wasn't taken. I went through, in my brief, each single point. The BLM gamely tried to rescue their plan by pointing to areas in the EIS where they said they had taken a hard look. I went through those, and I won't bore the Court with that long list unless you ask me to. But the point is that the hard look is required, the agency is required to actually analyze the place. I went to the doctor just the other week, and she gave me a pamphlet that addresses health issues for men my age. Men my age drink too much, and they don't get enough exercise, and so forth. And I was appreciative of the pamphlet. But then after I got the pamphlet, she came in, and she talked to me, and she analyzed my body. And she said, do you drink too much? Do you drive without your seat belt? Do you get enough exercise? The BLM did the first part. They did the pamphlet. They said, well, grazing can affect erosion. Livestock compete with desert bighorn sheep for forage. What they didn't do is they didn't go to the actual landscape itself and determine whether livestock was doing that here in this particular place. That's the basis of the hard look argument. I do wish I see the light is on, and I will retain those two minutes for rebuttal. Thank you, Your Honors. Thank you, counsel. May it please the Court. My name is Peter Grzewicki, and I represent the Bureau of Land Management. The district court correctly granted summary judgment to the Bureau of Land Management in this case because the Bureau's environmental impact statement fully complied with the National Environmental Policy Act. It did so by taking a hard look at the potential impacts of grazing and by considering a range of alternatives that is tailored to the project's purpose and need. Ultimately, Your Honors, the Bureau acted reasonably by describing the resource management plan in a manner that informed decision-making and public participation, while keeping in mind the context in which it was written. Briefly, I would like to address the mistake that I did make and that I did admit to, and I apologize for doing it. I suggested in my brief on page 49 that the resource management plan had the capability of changing permits. It doesn't, and I was wrong to suggest that it did. The classifications in the permits that are perennial and ephemeral for four of the allotments and perennial for one were not changed in any way, shape, or form, and I regret that I made that mistake. Ultimately, I don't believe that that mistake impacts the outcome of this case because the recommendations were acknowledged and because the reasoning behind why permit changes must be site-specific is provided in the record. So your opponent claims that they really don't have an opportunity when grazing permits are granted to challenge those permits on the basis of the environment. So, Your Honors, first of all, my best understanding is that they did indeed have an opportunity to challenge the permits in 2003 when they were last issued, and I believe that the- Well, walk us through the process. You don't typically do a second environmental impact statement or environmental assessment when you issue the permits, is that true? No, Your Honors, but what we do do is, and I can tell you, you know, this is an ongoing thing, right? Grazing has been going on for a long time. It continues to go on. The Bureau of Land Management monitors grazing. It has people out on the land. Each time it has the opportunity to perform NEPA analysis, it does so in terms of the grazing permits. Now, honestly, Your Honors, Congress has, in its infinite wisdom, provided a grazing rider to the Appropriations Act. And so the – and that rider basically says that the grazing permits shall be renewed and that existing terms and conditions shall remain in effect pending the completion of the required NEPA analysis. So I- The required what? The required NEPA analysis. So walk us through this. You have – let's assume for the sake of the argument that this programmatic EIS is approved, and you go forward with the grazing permits. So when you have a grazing permit, what environmental assessment do you do? So what will happen and what is currently happening is you will have a range specialist go out to each of the allotments, and what they will do is they will take utilization samples. And you can see examples of the discussions of that in the allotment assessments that were provided in the record. And basically what that is is it's taking what's called a transect. So they rope off about a mile long and some diameter, and they go through and they look at the utilization. They look at how much and what is sort of munching on the plants for lack of a better term. So then you calculate the appropriate animal units? So what you do is you try to – in doing that, you try to figure out whether or not you're reaching various targets that are established through the range health standards, which Arizona has a statewide set of that are part of both the prior land use plan as well as the current plan. And when they – and they then adjust the animal unit months, which is sort of the – AMU, yeah. Yeah, which is the – in this case, it would be 800 pounds of dry forage for cows. And what they're trying to do is they're trying to achieve the range health standards. And so that's part of the concern with this case. And respectfully, I completely disagree with the characterization of the allotment evaluations. The range specialists went out and they found that the range – that the standards were being met, that there was either stability or improvement, which is what the Arizona standards require. And these are the bases on which the Bureau of Land Management determines whether or not the range is in an appropriate state. And these are – and the – and the – excuse me. The permits are then adjusted in order to reflect. So, in other words, if I'm – if I'm understanding the way the process works, the range specialist goes out, they make the calculations, and then you adjust the AMUs in the grazing leases, correct? Yes, Your Honor. Okay. Now, where – at what point does any – any environmental group or anyone else have a chance to contest the conditions of the lease? So the conditions of the lease could be contested, as best I understand, each time the – a permit is renewed, right? And so – And how do they go about that? They would – so, for example, I believe that the Center for Biodiversity actually was – mailed the assessments in the 2003 evaluations. So they know that the assessments are being done. And then the – and then the permits require some level of NEPA. Typically, it's an environmental assessment. And environmental assessments are put forth for public participation and public comment. And they can – you know, I mean, they have to go through the typical APA. They have to explain their comments. They have to explain why they think there are problems. They have to go through an administrative appeals process. Then they – then they come through the district court and possibly on up to the Ninth Circuit, just as they did in this case with a programmatic document. So I thought I heard you say earlier that environmental assessments were not done for these grazing leases. Is that true or not? Your Honor, environmental assessments have not been complete on a – the terms and conditions as they were articulated in 2003, which also probably deserves some clarification, have been renewed periodically based on the grazing rider because current funding levels are – were not available to – Is that what you're saying? Yes, Your Honor. Okay. So if you don't do the assessments, how does Western Watersheds have the ability to contest the results of the assessments? So, Your Honor, and this goes, I believe, to the related concern about ripeness and FLTMA. And the fact of the matter is Western Watersheds Project knows how to bring FLTMA claims. There are undue degradation standards by which they could challenge the conditions and the continued conditions on the land. But the fact of the matter is that they haven't brought such a claim because at least in terms of the document we're dealing with here and the analysis we're dealing with here, this is a NEPA concern. And, you know, I don't want to speak to why they decided to do that. I just want to – I just would like to shift the focus back to the fact that ultimately what matters is whether or not we took a hard look. And we believe that we did take a hard look because we believe we articulated the impacts of grazing, albeit at a landscape or planning level, but we articulated that they, you know, for example, harm the habitat. They can compete with mule deer for forage. They can, you know, decrease the abundance and diversity of lizards due to the impacts they have on the habitat. So you listed all that. But I think the primary complaint of Western Watersheds is they use stale data. So, Your Honors, to that point, the difficulty with that is, first of all, the draft resource plan and the draft EIS come out in 2006, December of 2006 specifically. The evaluations are done in June of 2003. And all of them, the assessments are completed ultimately in September of 2003, but the evaluations occur in June of 2003. Each of these issues a five-year permit. And so this is the most up-to-date site-specific analysis we have, right? And at that point, the UMA field office is going to move on to trying to make a resource management plan. And that's an incredibly cumbersome task. I mean, as you all can see, you only have excerpts of the PRMP and of the EIS. The planning that goes into that is, you know, it's manpower. It's intensive. And they needed to and they can't do sort of simultaneous environmental assessments and resource management plans. Can I just ask you about the process? When you issue a permit, I assume that you pass upon that permit, at least in consideration of how the permit complies with the land use plan or the EIS that you had developed for that particular piece. I mean, the EIS or the land use plan establishes the base, does it not? So what the land use plan does is it establishes several things. So first what it does is it establishes desired future conditions, and then it establishes management actions which can achieve those desired future conditions. And so this is where we state, you know, that the acres available are what are being considered at the resource plan level. At the permit level, that's when things like Judge Thomas's point about the animal unit months and the actual cows on the land are determined. This plan provides no site-specific decisions. It is purely a land use level determination. Now, sometimes you get cases where that can be mixed, like the recent Western Watersheds v. Abbey case out of this court. But that's not the case as is present here. But the hard look from under NEPA requires that there be a thorough analysis of the land, including soil, including the impact of past grazing. Does it not? I mean, that's the basic document upon which the permits ultimately are judged. It is absolutely, Your Honor. The permits are judged on the allotment assessments and the evaluations that happen subsequent to that, while permits, while the resource management plan makes land available for subsequent permitting. And, Your Honors, we do believe that the record is present at this sort of landscape level for what is required to take a hard look at the impacts of grazing on the land. I mean, Your Honors, but it has to be the case that that is done at a programmatic level, because we have 1.3 million acres of Federal land being considered. If we were to take individual site-specific analysis of each animal, each, you know, each and every little detail of every land use plan, I don't know, that would be infeasible. I can't imagine that would happen. And similarly, that sort of dovetails into why we presented a reasonable range of alternatives, because ultimately the range of alternatives we provided were for the broadest possible decision to be made. If you think about it as a decision tree, we only are on the first rung of that decision tree. We've gone down one step, and we've said, is this land going to be available for grazing, or is it not? And so we divided up the land in very large swaths and said, yes, grazing, no grazing, no grazing, because that's the – because all we were considering were how much do we – how much of this land do we want to make available to the impacts that we did recognize. So to the quality of the grazing or the amount of grazing that is done between perennial and ephemeral, what you're suggesting is that that is never a part of the EIS. It is really to be addressed in the programs, the permits that are in fact reviewed in some future date? Yes, Your Honor. So the – it's to be – and the – and this is what I did my best to explain both in my notice of errata and in other portions of my brief. The timing in which classification ought to be reviewed is after an allotment assessment, when you actually have the data about the number of – amount of dry forage per acre, which is one of the criteria for classification of – as ephemeral. And to the extent, Your Honors, that the reply brief does point out there was a preferred alternative proposal very early in the process that suggested the potential for changing classifications. However, ultimately, the Bureau looked at the land use hand – planning handbook, which appellants cite too significantly and is, you know, the – is provided in the excerpts of records, and in particular ER 271 and 272, and said, we are only making land use decisions. And while we may have had a false start, gone down a rabbit hole that suggested classification was appropriate here, we decided as a matter of policy that's just not correct. So when we talk about the data here, we're dealing with arid to semi-arid, mostly arid. Does the record reflect at all the equilibrium or stability of the land over time? Because staleness has a different concept depending on the ecosystem involved. So, Your Honor, the – it does reflect the – the record certainly reflects the trend over time. Because if you think about the way the allotment assessments were done, they took what is now sort of referred to as legacy data, which is earlier inventories from the 80s. And what they looked at and what they said was, you know, these places are improving or they're maintaining stability. And so in that way, they are taking a look at the sort of broader picture. And I take your point to be that, you know, these ecosystems, they aren't sort of – they go through changes on a long-term basis. And it needs to be the case that we look at that basis. And we did look at that basis. But that ultimately, when we decide that the range health standards are being met, which all have sort of maintenance as a threshold, then what we're doing is saying the desired future conditions, we are at least maintaining the stability of these ecosystems. And in numerous places in the record, we are suggesting that we are improving. And so in 2002 and 2003, you did a hard enough look, for lack of a better term, to be able to set the base upon which you then can analyze into the future what kind of impact grazing would have or what kind of changes would happen in the land. Yes, Your Honor. We did – we believe that the basis for our decisions on grazing are those 2003 and 2002, the evaluations that happened in 2003, and that that look is at the site-specific level. And then we take from that that they are meeting range health standards. And in so doing, they have – that that is – that that is – that grazing is appropriate for and appropriate on this amount of – the amount of acreage that we've made available. I'm currently out of time, Your Honors. But if the Court has any further questions, I'd be happy to stay up and answer. Thank you, Your Honor. Thank you, Your Honors. Your Honors, with respect to Judge Sessions' question about whether that was a good – hard enough look, we heard from counsel that they take from these reports that the areas are meeting standards and grazing in that fashion is appropriate. But just read the documents.  They're saying it's a good enough look. That's what those statements – what those reports say. They say this area does not produce enough grass to graze in a perennial fashion, and we need to propose to change it. Many of these areas may be maintaining in stable condition, but the condition is currently poor. They're maintaining in poor condition. When you read those reports, that's what they say. With respect – I see I may not have answered your question, Judge Thomas, and I apologize for that. A litigant could challenge an EA when there is an EA, but there is no requirement – first of all, there's no requirement that these range health assessments, which is what you would challenge, there's no requirement that they ever be done again. Under the regulations, they have to be done once, and they were done once. They were done in 2002. They don't ever have to be done again. I understand that. My question was more is if you think it's inappropriate at the level they set in AMU in a particular grazing lease, you have the opportunity to challenge that at the time. That was my question, or whether you had it. He says yes, you say no. I don't quite say no. If the BLM were to reissue those – reissue EAs again instead of just renew them under this appropriations rider, then we would have that opportunity. But that hasn't happened in many years. It's now 2013. Bishop Allotment is still grazed perennially, and the others are still grazed perennially, ephemerally, even though over 10 years ago the experts all said that that should cease. Thank you, Your Honors. We ask the decision be reversed. Thank you, counsel. The case just argued is submitted.
judges: Sessions, Reinhardt, Thomas